Patricia WIENER, an individual,
Plaintiff,

v.

NEC ELECTRONICS, INC., a California corporation, and NEC Corporation, a Japanese corporation, Defendants.

No. C 91–20843 JW.

United States District Court,
N.D. California,
San Jose Division.

March 8, 1994.

Edwin H. Taylor, Blakely, Sokoloff, Taylor & Zafman, San Jose, CA, for plaintiff.

Charles D. Chalmers, Skjerven, Morrill, MacPherson, Franklin & Friel, San Jose, CA, for defendants.

Paul C. Valentine, Sacramento, CA, Special Master.

ORDER DENYING PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

WARE, District Judge.

In this lawsuit, Plaintiff Patricia Wiener alleges that Defendants NEC Electronics,

Inc., a California Corporation (NECEL) and NEC Corporation, a Japanese corporation (NEC) infringed her U.S. Patent No. 3,771,-145 covering video random access memory (VRAM) circuits. Plaintiff contends that NEC Electronics directly infringed by using and selling VRAMs in the United States in violation of 35 U.S.C. § 271(a). Plaintiff alleges that NEC indirectly infringed by making and selling VRAMs to NECEL in Japan for resale in the United States.

The issue before the Court is whether Plaintiff may compel Defendants to produce particular documents regarding the cost and value of VRAMs manufactured and sold by Defendants. The particular documents in question were compiled by Defendants for submission in confidence to the United States Department of Commerce as part of an "anti-dumping" investigation under the Tariff Act of 1930, 19 U.S.C. § 1202 et seq. Paul C. Valentine, the Special Master to whom the case was assigned for certain pretrial proceedings, recommended that Plaintiff's motion to compel production be denied. After *de novo* review, the Court adopts the Master's recommendation and accordingly DENIES Plaintiff's motion to compel production of the requested documents.

## BACKGROUND

According to documents produced in the case, NEC introduced its first video random access memory products, commonly referred to as VRAMs, to the United States market in 1985. Apparently acting on the complaint of competitors, the Department of Commerce initiated an investigation to determine whether video RAMs and other memory components were being sold in the United States by Japanese manufacturers at less than fair value, so-called "dumping." The Department required major Japanese RAM manufacturers, including NEC, to respond to questionnaires designed to determine if dumping was occurring. NEC and the other manufacturers were required to produce certain cost information. The Department used the information to construct what it considered to be reasonable prices for any components to be sold in the United States.

After receiving the information, the Department made a preliminary determination that video RAMs from Japan were, indeed, being sold in the United States at less than fair value. Consequently, NEC and the other Japanese manufacturers entered into a "suspension agreement" with the Department. The Department agreed to suspend its antidumping investigation in exchange for an agreement by the signatories to sell covered products at no less than a "fair price" which would be established by the Department. The signatories agreed to supply the Department with cost and sales information for specified memory products on a quarterly basis. The covered products included VRAMS and other memory components. The information was to be supplied with the understanding that it would be treated as confidential proprietary information. The Department used the information to calculate a "fair value" for each of the components, which it supplied to the signatories on a confidential basis.

After learning of the existence of this information, Plaintiff requested NEC to produce the cost and sales information which it had supplied to the Department and when refused, came to the Special Master and to this Court to compel NEC to comply with the request. In support of her motion to compel production, Plaintiff contends that the information is relevant to calculation of damages. Plaintiff contends that she is seeking damages adequate to compensate her for Defendants' infringement in the form of reasonable royalties pursuant to 35 U.S.C. § 284. Reasonable royalty damages are based on a hypothetical negotiation between a patent owner, as a hypothetical willing licensor, and the accused infringer, as a hypothetical willing licensee, at the time the alleged infringement began. Plaintiff contends that the information which NEC supplied to the Department is relevant because the cost of production information and the Department's fair value determinations are relevant to proving what would be a reasonable royalty.

NEC and NECEL oppose production, primarily because the information was submitted as business proprietary information. Defendants contend that the statute under

which the information was supplied precludes the Department from divulging confidential business information. Defendants contends that this statutory privilege precludes Plaintiff from to using civil discovery to compel Defendants from producing information which Plaintiff can not obtain directly. In reply, Plaintiff contends that the confidentiality imposed on the information under the Tariff Act is no different from similar statutory confidences with respect to income tax returns and patent applications, which are subject to discovery in civil actions.

As correctly observed by the Special Master, at issue is the clash of two strong public policies: the right of a litigant to seek discovery of all facts reasonably calculated to lead to admissible evidence in a civil proceeding versus the interest of the federal government in regulating foreign trade. As discussed in detail below, on the facts of this case, the interests of the private litigant must give way and the request must be denied.

## DISCUSSION

### 1. THE TARIFF ACT

■ The Tariff Act of 1930, as amended (the "Tariff Act"), governs access of the U.S. government and all other persons to business proprietary information submitted during the course of antidumping proceedings. The Act contains a general prohibition against nonconsensual disclosure, unless the disclosure fits statutorily defined exceptions:

> Except as provided for in subsection (a)(4)(A) and subsection (c) of this section, information submitted to the [Department of Commerce] ... which is designated as

proprietary by the person submitting it shall not be disclosed to any person ... without the consent of the person submitting it. 19 U.S.C. § 1677f(b)(1).

There are five statutory exceptions to the prohibition against disclosure.

#### a. Administrative Protective Order.

Under subsection (c)(1), in the course of an investigation the Department may make limited disclosure of submitted proprietary information to certain parties under an administrative protective order. 19 U.S.C. § 1677f(c). There are three prerequisites to such limited disclosure. First, only "interested parties who are parties to the proceeding" are permitted access to submitted proprietary information under an administrative protective order. Second, the party wishing to gain access to submitted proprietary information under an administrative and protective order must make a written application to the Department of Commerce. Third, the Department of Commerce must issue an administrative protective order which is properly drawn under the Department's regulations and all other relevant authority.

The Tariff Act, which enumerates seven different kinds of "interested parties." *See* 19 U.S.C. § 1677(9).[1] Plaintiff does not fall within any of these seven categories.

Nor is Plaintiff a "party to the proceeding." A "party to the proceeding" means "any interested party ... which actively participates, through written submissions of factual information or written argument, in a particular decision by the Secretary [of Commerce] subject to judicial review." 19 C.F.R.

---

1. The term "interested party" means:

(A) a foreign manufacturer, producer, or exporter, or the United States importer, of merchandise which is the subject of an investigation under this subtitle or a trade or business association a majority of the members of which are importers of such merchandise.

(B) the government of a country in which such merchandise is produced or manufactured,

(C) a manufacturer, producer, or wholesaler in the United States of a like product,

(D) a certified union or recognized union or group of workers which is representative of an industry engaged in the manufacture, production, or wholesale in the United States of a like product,

(E) a trade or business association a majority of whose members manufacture, produce, or wholesale a like product in the United States,

(F) an association, a majority of whose members is composed of interested parties described in subparagraph (C), (D), or (E) with respect to a like product, and

(G) in any investigation under this subtitle involving an industry engaged in producing a processed agricultural product, as defined in paragraph (4)(E), a coalition or trade association which is representative of either—

(i) processors,

(ii) processors and producers, or

(iii) processors and growers ...

19 U.S.C. § 1677(9).

§ 353.2(*o*). Plaintiff did not actively participate in any proceeding for which she has requested submitted proprietary information.

Finally, Plaintiff does not meet the remaining two requirements to obtain access to submitted proprietary information under an administrative protective order. Plaintiff did not file a written application for access to submitted proprietary information with the Department and the Department did not grant Plaintiff access to submitted proprietary information in the administrative protective orders issued in the proceedings.

b. Judicial Protective Order.

Under the Tariff Act, if the Department of Commerce denies a request for access to submitted proprietary information, the person requesting access may apply to the U.S. Court of International Trade for an order directing the Department to make the information available. 19 U.S.C. § 1677f(c)(2). The person requesting access must first apply to the Department of Commerce. The person on whose behalf the information is requested must be "an interested party who is a party to the investigation in connection with which the information was obtained or developed." 19 U.S.C. § 1677f(c)(2)(B). As indicated above, Plaintiff can meet neither of these requirements. In addition, pursuant to the statute, no other court except the Court of International Trade can order the granting of access. As Special Master Valentine noted, disclosure of submitted proprietary information under a judicial protective order was made in *Rhone Poulenc, Inc. v. United States,* 2 CIT 116, 4 ITRD 1386, 1387, 1981 WL 2483 (Ct.Intl.Trade 1987). However, the disclosure was made pursuant to the restrictions of the Tariff Act discussed above. In keeping with 19 U.S.C. § 1977f(c)(2), the Court of International Trade was the court granting access, and, in keeping with 19 U.S.C. § 1677f(c)(2)(B), the parties to whom the Court of International Trade granted access were interested parties who *were* parties to the proceeding. In *Timken Co. v. United States,* 659 F.Supp. 239 (Ct.Int'l Trade 1987), the Court of International Trade granted access to counsel of the Petitioner, the domestic bearing manufacturer,

who was an interested party and a party to the Department's proceeding. *Rhone Poulenc* and *Timken* therefore do not support disclosure of NEC's submitted proprietary information under a judicial protective order to Plaintiff in this case.

This Court, therefore, does not have jurisdiction and is prohibited by statute from granting access to submitted proprietary information.

c. Consent.

The other exception which could allow disclosure is "consent" of the person submitting the proprietary information. 19 U.S.C. § 1677f(b)(1). NEC Corporation has not consented or voluntarily agreed to the disclosure by anyone of either proprietary information submitted by NEC to the Department, or the information which the Department of Commerce provided to NEC.

2. PUBLIC POLICY

The Department and the U.S. International Trade Commission rely heavily on proprietary information submitted by both U.S. and foreign parties in order to conduct their antidumping duty investigations. Permitting private plaintiffs access to proprietary information and documents submitted during the course of those agencies' antidumping procedures would create a powerful disincentive for those parties to provide the agencies with submitted proprietary information in future antidumping investigations. *Monsanto Industrial Chemicals Co. v. United States,* 6 CIT 241, 243, 1983 WL 2224 (Ct.Int'l.Trade 1983) ("Release of such requested sensitive confidential documents ... without compelling reasons surely dampens the propensity of foreign producers to divulge confidential information in future trade cases.")

In *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* C.A. nos. 74–2451 & 74–3247, M.D.L. No. 189, 1978–1 (CCH) Trade Cas. ¶ 62,019 (E.D.Pa.1978), plaintiffs in a private antitrust action sought discovery from GTE, a non-party, of certain confidential and non-confidential documents which GTE had produced to the ITC during the ITC's antidumping investigation. Plaintiffs also had requested that defendants in the

antitrust action—Japanese electronic products manufacturers—produce documents related to the prior ITC proceeding. The court rejected Plaintiffs' request for confidential materials submitted in the ITC litigation. The court recognized that permitting Plaintiffs access would require the court to vacate the protective order in the ITC investigation. The Court held that "[i]t is an abuse of the discovery process to order a defendant in the instant litigation to produce all documents he had submitted in another case under the judicial imprimatur that those documents, when submitted, were judicially protected." 1978–1 (CCH) Trade Cas. at 74,367–74,368.

### 3. PRIVILEGE

██ Under the Federal Rules of Civil Procedure, parties may not obtain discovery of relevant documents if those documents are "privileged." *See* Fed.R.Civ.P. 26(b)(1). Rule 501 of the Federal Rules of Evidence provides that, "[e]xcept as otherwise . . . provided by Act of Congress . . . the privilege of a . . . person . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501. Federal courts have recognized that information which a party is required to submit to a government agency is protected from disclosure by a "required reports" privilege. *Ass'n for Women in Science v. Califano,* 566 F.2d 339 (D.C.Cir.1977); *In re Grand Jury Subpoena Dated November 14, 1989,* 728 F.Supp. 368 (W.D.Penn. 1990).

██ The required report privilege has two principal prerequisites. First, the report must be mandated. In this case, the Department directed NEC to make the reports in question. During the antidumping duty investigation, the Department directed NEC to respond to its antidumping duty questionnaire. Failure to respond to an antidumping duty questionnaire carries substantial penalties.

Second, the federal law must provide, either explicitly or implicitly, for the privilege. Some statutes, such as the Census statute, expressly privilege or protect reports from legal process. *See* 13 U.S.C. section 9(a) (providing that copies of Census reports are expressly "immune from legal process," and without the consent of the submitter, copies of such reports shall not be used "for any purpose in any action, suit, or other judicial or administrative proceeding.") Such statutes provide an absolute bar to discovery.

At the other end of the spectrum are statutes which provide that the report is confidential only while it is in the hands of the government agency. Such statutes—known as "housekeeping statutes"—only prohibit the government agency from disclosing the report; they do not provide the reporter with a privilege to refuse to produce file copies of the report in response to discovery. *See* Note: *The Required Report Privileges,* 56 NW.U.L.Rev. 283, 286 & 294–96 (1961); *St. Regis Paper Co. v. United States,* 368 U.S. 208, 215–16 & n. 5, 82 S.Ct. 289, 293–94 & n. 5, 7 L.Ed.2d 240 (1961) (prior to amendment, census statute prohibited only the Secretary of the Census Bureau and its officers an employees from using or disclosing census reports); 35 U.S.C. § 122 (patent statute explicitly states that applications for patent shall be kept in confidence); *In re Domestic Air Transportation Antitrust Litigation,* 141 F.R.D. 556, 560 (N.D.Ga.1992); *In re Air Passenger Computer Reservation Systems Antitrust Litigation,* 116 F.R.D. 390, 393 (C.D.Cal.1986) (both holding that statute governing antitrust civil investigative demands did not provide a privilege for reports in the possession of the reporter because the statute expressly applied only to reports "while in the possession of the custodian" and the legislative history of the statute demonstrated that Congress did not intend to create a privilege); *see also Heathman v. U.S. Dist. Ct. for Central Dist. of Cal.,* 503 F.2d 1032 (9th Cir.1974); *Stokwitz v. United States,* 831 F.2d 893 (9th Cir.1987) (holding that federal taxation statute prohibited *only* IRS, not taxpayers, from disclosing tax returns).

In contrast to "housekeeping statutes," the provision governing access to submitted proprietary information in antidumping procedures does not limit confidentiality protection to reports while they are in the custody of the Department and the ITC. It prohibits all disclosures that do not meet one of a few

narrowly tailored exceptions. Federal courts have held that such statutes confer a qualified privilege on both the reporter and the federal agency involved. *See e.g. Califano,* 566 F.2d at 345 (finding a qualified privilege provided by an executive order that stated "no information as to the contents thereof shall be disclosed except as the Chairman of the Civil Service Commission or the head of the agency concerned may determine for good cause shown.").

Because the required reports privilege is "qualified," it can be outweighed by a showing of substantial need. In this case, Plaintiff will be able to obtain cost and value information regarding the devices in question from the records NEC keeps independently from its submission to the Department.

Plaintiff's primary need for the information is for corroboration. The Court recognizes the value of corroboration and the interest which a litigant has in obtaining corroborating or, perhaps more importantly, uncorroborating information from an opponent. However, on balance, the Court finds Plaintiff's interests insufficient to overcome the Department's need to maintain the utmost confidentiality of proprietary information submitted in antidumping investigations.[2] *See, e.g., In re Grand Jury Subpoena Dated November 14, 1989,* 728 F.Supp. 368, 374 (W.D.Penn. 1990).

## CONCLUSION

Because she seeks discovery of information which is privileged and statutorily immune from discovery, Plaintiff's motion to compel production of documents is DENIED.

IT IS SO ORDERED.

---

**2.** Some portions of NEC's submissions to the Department may be the kind of information some jurisdictions protect from disclosure under a "self-critical analysis" privilege. Although the Ninth Circuit has not expressly adopted this privilege, it has outlined the requirements of the privilege: (1) the information must result from a critical self-analysis undertaken by the party seeking protection; (2) the public must have a strong interest in preserving the free flow of the type of information sought; (3) the information must be of the type whose flow would be curtailed if discovery were allowed; and (4) the document must be prepared with the expectation that it would be kept confidential, and must in fact have been kept confidential. *Dowling v. American Hawaii Cruises, Inc.,* 971 F.2d 423, 426 (9th Cir.1992). Some of the data NEC collected, analyzed and submitted to the Department, may constitute a form of self-critical analysis.